## ORGANIZED FISHERMEN OF FLORIDA, et al. v STATE OF FLORIDA, MARINE FISHERIES COMMISSION
### Case No. 86-2761R
State of Florida, Division of Administrative Hearings

October 11, 1986

### APPEARANCES OF COUNSEL

**Kenneth G. Oertel, Segundo J. Fernandez,** and **Douglas P. Manson, Oertel & Hoffman, P.A.,** for petitioners.

**Jim Smith,** Attorney General, **David G. Guest,** Chief, Special Projects Section, Department of Legal Affairs, **Beverly S. McLear,** Assistant Attorney General, **Dean C. Kowalchyk,** Assistant Attorney General, and **Charles L. Shelfer** for respondent.

**Philip S. Parson** and **Joseph W. Landers, Jr., Landers, Parsons & Uhlfelder,** for intervenor.

## OPINION

ROBERT T. BENTON, II, Hearing Officer.

This matter came on for hearing in Tallahassee, Florida, before Robert T. Benton, II, Hearing Officer of the Division of Administrative Hearings, on September 6, 1986, and concluded on September 12, 1986. The parties filed proposed orders on September 26, 1986. The attached appendix addresses proposed findings of fact by number.

These proceedings began on July 25, 1986, with the filing of a petition to invalidate proposed agency rules pertaining to redfish. The petitioners challenge amendments proposed to Rule 46-22.001, 46-22.002 and 46-22.003, Florida Administrative Code. They also challenge proposed rules 46-22.004 through 46-22.007 in their entirety.

By order entered August 8, 1986, the petition of the Florida Conservation Association regarding intervention was granted.

Many of the petitioners in the present case filed a second petition to invalid agency rule, docketed as Case No. 86-2956R, in which they alleged that the Marine Fisheries Commission had adopted and implemented a rule requiring that "all future rules regulating the catch of red drum . . . be drafted to ach[ie]ve an escapement level of fifty times the escapement calculated for the period prior to September 1985." By order entered August 26, 1986, Cases Nos. 86-2761R and 86-2956R were consolidated.

On August 28, 1986, counsel for petitioners filed notices of dismissal in the present case on behalf of Mike Duke, Ellison Fishery, Fulford Fish Company, Fishermen's Market, Inc., James A. Burch and Thomas Live Shrimp, originally named as petitioners. At hearing, on the close of petitioners' case in chief, counsel for petitioners took a dismissal of the petition in Case No. 86-2956R, by so stating on the record.

The final hearing was originally scheduled to begin on August 26, 1986, but was continued until September 8, 1986, with the agreement of all parties. In order to accommodate a witness, the final hearing was reset to begin on September 6, 1986, and went six days.

## *ISSUE*

Whether the amendments respondent proposed to Rule 46-22.001, 46-22.002 and 46-22.003, Florida Administrative Code, and the new rules it proposes, 46-22.004 through 46-22.007, or any of them, constitute an invalid exercise of delegated legislative authority, within the meaning of Section 120.54(4), Florida Statutes, (1985)?

## FINDINGS OF FACT

Comprised largely of commercial fisherman, the petitioners are organizations which represent commercial fishing interests, including but not only commercial fisherman, but also fish houses, fish processors, and at least one restaurateur. The parties have stipulated that petitioners have standing to bring this rule challenge.

The intervenor, Florida Conservation Association (FCA), is an organization to which recreational fisherman and "a number of people . . . involves in the sports fishing industry" (T VIII. 7), including fishing guides, marina owners, bait and tackle dealers, tackle manufacturers, and "motels that . . . cater to a fishing clientele," (T.VIII. 8) belong. According to the intervenor's executive director, "one of the primary goals of the organization . . . has been to work towards gamefish status for redfish, which would be basically what we have been trying to do with the rule, for game fish status." (T.VIII 6.)

Respondent Marine Fisheries Commission (MFC) is charged by statute with regulating fishing in the salt waters of the state, which extend nine nautical miles from shore. (T.I.29) The rules and rule amendments the MFC has proposed for redfish were published on July 11, 1986, in Volume 12, No. 28 of the Florida Administrative Weekly on pages 2595, 2596 and 1597. They read, as follows:

*46-22.001 Purpose, Intent and Repeal of Other Laws.*

The purpose and intent of this chapter are to protect, manage, conserve and replenish Florida's depleted red drum (redfish) resource, species *Sciaenops ocellata,* which has suffered extreme declines in abundance in recent years and which is now overfished throughout the state. This chapter will *implement measures designed to reduce fishing pressure on this species; including* initially impose minimum and maximum size limits, *bag limits, closed season, and prohibition of sale,* for harvestable redfish *harvested from state waters,* to provide interim protection for the resource while a comprehensive management scheme is being formulated for later promulgation in this chapter. Accordingly, it is the intent of this chapter to repeal and replace those portions of section 370.11(2)(a)4., Florida Statutes dealing with redfish. This chapter is not intended, and shall not be construed, to repeal any other portion of section 370.11(2)(a)4., Florida Statutes; any other subdivision of section 370.11, Florida Statutes; or any other general or local law directly or indirectly relating to or providing protection for the redfish resource.

. . . . . . . . . . .

*46-22.002 Definitions*

210

(1) "Harvest means the catching or taking of a fish by any means whatsoever, followed by a reduction of such fish to possession. *"Harvest" also includes the intentional killing of a fish, whether or not it is subsequently reduced to possession.* Fish that are caught but immediately returned to the water free, alive and unharmed are not harvested. In addition, temporary possession of a fish for the purpose of measuring it to determine compliance with the minimum or maximum size requirements of this chapter shall not constitute harvesting such fish, provided that it is measured immediately after taking, and immediately returned to the water free, alive and unharmed if undersize or oversize.

(2) *"Land," when used in connection with the harvest of a fish, means the physical act of bringing the harvested fish ashore.*

(3)(2) "Red drum" or "redfish" means any fish of the species *Sciaenops Ocellata* or any part thereof. *"Native redfish" means any redfish harvested from the territorial waters of the State of Florida.*

(5)(4) "Total length" means the length of a fish as measured from the tip of the snout to the tip of the tail.

(6) *"Vessel" means and includes every description of water craft used or capable of being used as a means of transportation on water, including nondisplacement craft and any aircraft designed to maneuver on water.*

*46-22.003 Size Limits.*

(2) No person shall harvest in or from the following designated waters of the State of Florida at any time, or unnecessarily destroy, any redfish of total length less than *18 inches.* that set forth as follows:

(a) In the Northwest region as hereinafter defined, redfish of total length of less than 16 inches.

(b) In the remainder of the state, redfish of total length less than 18 inches.

(c) For purposes of this subsection, the term "Northwest region" shall mean and include all state waters along the Gulf of Mexico north and west of a straight line drawn from Bowlegs Point in Dixie County, southwesterly through marker 16, and continuing to the outer limit of state waters.

(2) No person shall harvest in or from the waters of the State of Florida at any time, or unnecessarily destroy, any redfish of total length greater than 32 inches, except that one (1) redfish larger than

**211**

this maximum size limit may be harvested per person, per day. No person shall possess at any time more than one redfish larger than 32 inches in total length, harvested from state waters.

(2)(a) *No person shall harvest in or from the waters of the State of Florida at any time, or unnecessarily destroy, more than one (1) redfish per day of total length greater than 32 inches.*

(b) *No personal shall possess more than one (1) redfish of total length greater than 32 inches, harvested from waters of the State of Florida.*

(3) It is unlawful for any person to possess, transport, buy, sell, exchange or attempt to buy, sell or exchange any redfish harvested in violation of this chapter.

. . . . . . . . . . .

*46-22.004 Prohibition on Sale and Commercial Harvest of Native Redfish.*

(1) *It is unlawful for any person to:*

(a) *Buy, sell, exchange or attempt to buy, sell or exchange any native redfish.*

(b) *Harvest, possess or transport, for purposes of sale or with intent to sell, any native redfish.*

(2) *The prohibitions contained in subsection (1) of this section do not apply to non-native redfish that have entered the State of Florida in interstate commerce. However, the burden shall be upon the person possessing such redfish for sale or exchange to show, by appropriate receipt(s), bill(s) of sale, or bill(s) of lading, that such redfish originated from a point outside the waters of the State of Florida, and entered the state in interstate commerce.*

(3) *It is unlawful for any wholesale or retail seafood dealer or restaurant to possess, buy, sell, or store any native redfish, or permit any native redfish to be possessed, bought, sold or stored on, in, or about the premises or vehicles where such wholesale or retail seafood business or restaurant is carried on or conducted; provided, however, that native redfish which have been lawfully harvested may be kept on the premises of a restaurant for the limited purpose of preparing such redfish for consumption by the person who harvested them, so long as such redfish are packaged or on strings with tags bearing the name and address of the owner clearly written thereon.*

(4) When any person buys, sells, possesses or transports non-native redfish under circumstances requiring documentation under this

212

section, failure to maintain such documentation, or to promptly produce same at the request of any duly authorized law enforcement or conservation officer, shall constitute a separate offense under this chapter and shall also constitute prima facie evidence that such redfish were harvested from Florida waters and are being transported and/or possessed for purposes of sale.

. . . . . . . . . . .

*46-22.005 Season, Bag and Possession Limits.*

(1) During the months of March and April, the harvest of redfish in or from the state waters or possession of native redfish is prohibited. Possession of redfish by any person aboard a vessel fishing in state waters during such months constitutes prima facie evidence that such redfish were harvested out-of-season in tate waters.

(2)(a) *Except as provided in subsection (1), all persons are subject to a bag limit of five (5) native redfish per person, per day, and a possession limit of five (5) native redfish per person.*

(b) *Only one (1) native redfish larger than 32 inches total length may be harvested per person, per day, and no more than one (1) such redfish may be possessed by any person at any time.*

(c) *Possession of redfish in excess of the applicable bag or possession limit by any person aboard a vessel fishing in state waters constitutes prima facie evidence that such redfish were harvested from state waters.*

(3) *Nothing in this section shall be construed to permit the harvest of native redfish from any area during any time, or the use of any gear where same is otherwise prohibited by law.*

*46-22.006 Other Prohibitions.*

(1) *The harvest of any redfish in or from state waters by or with the use of any treble hook in conjunction with live or dead natural bait is prohibited. Gigging, spearing, or snagging (snatch hooking) of redfish in or from state waters is prohibited.*

(2) *It is unlawful for any person to possess, transport, buy, sell, exchange or attempt to buy, sell or exchange any redfish harvested in violation of this chapter.*

(3) *When any provision of this chapter is violated by a person aboard a vessel, the operator of that vessel, if different from such person, shall be deemed to have assisted and participated in the violation and such assistance and participation shall constitute a separate offense under this chapter.*

**213**

(4) *All redfish harvested from Florida waters shall be landed in a whole condition. The possession, while on state waters, of redfish that have been deheaded, sliced, divided, filleted, ground, skinned, scaled or deboned is prohibited. Mere evisceration or "gutting" of redfish, or mere removal of gills from redfish, before landing is not prohibited. Preparation of redfish for immediately consumption on board the vessel from which the fish were caught is not prohibited.*

*46-22.007. Severability.*

If any provision of this rule chapter, or its application to any person or circumstances is held invalid; the invalidity shall not affect other provisions or applications of the chapter which can be given effect without the invalid provision or application, and to this end the provisions of this rule chapter are declared severable.

Petitioners' Exhibit No.

(Added language underscored, deleted language struck through)

The proposed rules and rule amendments under challenge are designed to replace the initial redfish rules, which took effect September 12, 1985, and remain in force. Since before the current rules' adoption, statutory provisions have imposed a statewide 12-inch minimum size limit for redfish, Section 370.11(2)(a)4, Florida Statutes (1985), and forbidden the use of purse seines. Section 370.08(3), Florida Statutes (1985).

### Youth and Age

The redfish, also known as red drum and, to ichthyologists, as *Sciaenops ocellatus,* have a life span of 25 to 35 years. The adult redfish or "bull reds" swim offshort in deep water ordinarily, but not always, in schools. They are commonly found with schools of blue runner and little tunny. Respondent's Exhibit No. 29, 2-1. Schools of adult redfish are not found in in short waters.

But adults do approach the mouths of estuaries to spawn in the fall, mostly in September. Eggs borne by incoming tides and newly hatched, microscopic redfish larvae swimming inland make their way through the passes and well up into the bays and bayous along Florida's coasts, often all the way into fresh water, where rivers empty into the estuaries.

By April of the following year, some redfish spawned in September have attained a length of 12 inches. By the following September, all redfish spawned a year earlier have reached 12 inches in length. A redfish gaines one to five pounds a year. (T.I.31) When they are 18 to

214

26 inches long, they weight from 3 to 6 pounds. On average, an 18 inch redfish is about a year and a half old.

Juvenile redfish also swim in schools, often with sea trout, mullet and catfish. Once a redfish reaches three to four pounds, man is one of the few creatures in the estuaries big enough to eat it. (T.I.45) But scientists put the mortality rate for juvenile redfish at 30 percent (T.59) Only when they are about 4½ reds old do redfish leave the juvenile population's esuarine habitat for the blue waters the adult population inhabits. On average they then weight 12 to 14 pounds and have obtained a length of 29 to 30 inches.

Tagging studies and age frequency data suggest that as few as two percent of redfish recruits, or perhaps only a tenth of that number, survive long enough to escape the estuary. (T.I.63) For at least the last ten years, the escapement rate has been on this order of magnitude, and the escapement rate may have been dropping during this period. (T.I.67) The size distribution of redfish taken offshort reflects significantly lower numbers of spawners escaping during the last 20-some years than previously.

Spawning redfish tend to return to the point on the coast where they themselves were spawned, but this is by no means a hard and fast rule: "Drift", also called diffusion or filtration, is known to occur. Redfish range throughout the Gulf of Mexico and are found in the Atlantic Ocean as far north as New Jersey. Because redfish caught offshort are taken with purse seines, they cannot legally be landed in Florida. They are mostly brought ashore in Louisiana and mostly caught in that part of the Gulf. Juvenile redfish in the Florida Keys are not believed to swim back and forth between the Gulf and the Atlantic, but adult redfish may.

### Slackened Redfish

Commercial fishing offshort requires a six-figure investment in boat and equipment and a crew of several men. Until relatively recently, the big offshore operations largely ignored redfish, in favor of fish that could be sold at higher prices. But a dramatic increase in the demand for redfish has provided the economic incentive to make redfish an important target of the offshort fishery since 1982 or 1983. (The redfish's new-found popularity has been attributed to a New Orleans chef, who made famous a dish called "blackened redfish.")

For whatever reason, massive catches of redfish offshort have depleted the adult stock of redfish in the last four or five years by as much as half, by some estimates. Before 1983, catches averaged less

**215**

than 100,000 pounds a year. In the first half of 1986, some 7,000,000 pounds of redfish were taken in federal waters in the Gulf of Mexico.

In other species, declines in the numbers of spawners have precipitated collapses of fisheries. The pattern has been, however, that declines in spawning populations have initially causes increases, rather than decreases, in juvenile populations. In the case of the yellow croaker, for example, the juvenile population initially increased as the adult population dwindled. Only after 80 percent or more of the spawning stock was wiped out did a dramatic drop in the juvenile population ensue, spelling the end of the fisher.

Whether the juvenile redfish stock has diminished in consequence of the decline of the spawner population is not clear. According to anecdotal evidence from Steinhatchee, the redfish catch there has increased over the last five years. The evidence did not establish whether fisherman's efforts to catch juvenile redfish at Steinhatchee or elsewhere in shall state waters have changed significantly in recent years. Steinhatchee fisherman report large schools of two to four pound redfish beginning in October. Such reports are often unreliable evidence of general conditions, however.

Trends in catch data are evidence of population trends, but they require careful interpretation. For one thing, experts generally believe the commercial catch to be under-reported and the recreational catch to be overestimated. (T.I.48-9) Constant catches in response to increasing effort may reflect a decline in population. Even increasing catches are not incompatible with population decline, considered in conjunction with other factors.

The most recent catch data from Charlotte Harbor suggest smaller catches last year and the year before than in immediately prior years, during which the trend was generally up. But last year's statistics particularly are subject to revision and should be treated as preliminary only. To some extent, moreover, last year's change from a 12-inch to an 18-inch minimum size limit in Charlotte Harbor would account for any decrease in catch. The Charlotte Harbor redfish catch reported for 1984 is comparable to catches reported in the mid 1950s, 1964, and 1969, and exceeds the redfish catches reported in 1967, 1966, and certain earlier years. In short, the Charlotte Harbor data since 1983 neither confirm the previous upward trend nor establish any change in trend.

Catch statistics with regard to the state as a whole are similarly inconclusive. In 1979, fishermen caught 3,177,590 pounds of redfish in Florida waters. The total catch fell by moe than a third to 1,917,005

216

pounds in 1980, and climbed to 3,160,122 pounds in 1981, about the level of two years before, even excluding recreational catches in January and February. In 1982, the total catch increased some two and a half times to 8,977,274 pounds, although MFC's executive director suspects that the recreational catch estimates, and, therefore, the totals for 1982 are inflated. The total redfish catch fell to 5,738,260 pounds in 1983, then rose to 6,375,250 pounds in 1984. Table 5, Petitioner's Exhibit No. 4. These catches do not include adult redfish in any significant numbers (T.I.33)

### Fish Scaling

MFC staff used a computer model developed by one of the commissioners, William W. Fox, Jr., to predict the effects regulatory changes would have on the escapement rate. This computer model, the generalized exploited population simulator (GXPOPS), has been used to predict the population dynamics of such diverse species as pandalic shrimp, with its "protandric hermaphroditic life history strategy," Petitioner's Exhibit No. 8, p. 38, and grouper, a "protogynic hermaphroditic population." *Id.* Redfish have distinct genders and differ from grouper and shrimp in other important attributes.

Computer models are the only tools available for predicting population changes in response to regulatory changes, however; and, as far as the evidence showed, no other computer model has been more closely tailored to redfish or would be any more likely to predict the effects of regulatory changes on redfish populations more accurately than GXPOPS. Various GXPOPS generated tables are in evidence displaying data stated in millions of pounds of redfish, or in millions of fish, but nobody knows how many redfish are in the sea, so that a principal use of the numbers is as ratios; more than one scale has been used, and not all the tables are directly comparable.

The MFC considered what biological or resource objective to set in terms of a proportional increase in the rate of escapement. The greater the fraction of juvenile recruits that survive long enough to escape the estuaries, the more rapidly the diminished spawning stock could be replenished offshort. Although there is some confusion on the point, it is not an unfair characterization to say that the MFC adopted a 50-fold increase in the escapement rate as its biological goal for redfish.

If, as may be the case, the present escapement rate is only 0.2 percent, a 50-fold increase would only bring the escapement rate to half the level advocated by the Gulf of Mexico Fisheries Management Council. If, as may also be the case, a dramatic decrease in the number of recruits is either imminent or already in progress, even a 50-fold

**217**

increase in the rate of escapement may not increase the number of spawners leaving the estuaries to the levels needed to preserve the redfishery.

The evidence falls short of showing that the MFC has set the escapement rate goal too high. On the contrary, the evidence established that the MFC set the escapement rate goal so low that attaining the goal will not guarantee the continued viability of the redfish fishery. If, as respondent's executive director testified, it is like driving toward a cliff in the fog, the wisest thing might be to stop the car till the fog clears.

### Means To An End

Once a biological or resource goal has been set, the question becomes how to reach the goal. The MFC considered two options that the GXPOPS model predicted would meet its resource goal without closing down the commercial fishery: a five-month closed season together with a 17 inch minimum size limit; and a six-month closed season together with a 16-inch minimum size limit. There are numerous other approaches that would not involve conferring gamefish status on the redfish. Exhibit 1 to Dr. Fox's deposition; Dr. Austin's testimony. It may be that prohibiting redfishing for three, instead of only for two months would have permitted continuation of the commercial fishery. (T.XI.52-4)

In regulated fisheries throughout the world "there is a fairly clear hierarchy," (T.X.72), among types of regulations. Minimum-size limits, then closed seasons, then catch restrictions (bag limits for recreational fisherman and quotas for commercial fishermen) are preferred, in that order, both because within each category the magnitude of change necessary to accomplish the same result increases in descending order; and because the complexity of assumptions that must be made to predict the effect of the regulation increases for each category in descending order.

In the present case, for example, an increase of three inches in the minimum size limit applicable in peninsular territorial waters, from 18 to 21 inches, would be a less drastic change than leaving the minimum size limit at 18 inches and closing state waters to the taking of redfish for five months, although either change would accomplish approximately the same increase in the escapement rate. The only assumption that underlie minimum size restrictions concern age size correlations and the "mortality that occurs when fish have to be released [because they are too small], which is relatively well known in this fisher." (T.X.74) Predicting the effect of closed seasons requires more complex

218

assumptions about seasonal abundance of the fish, the likelihood that fishermen's efforts to catch the species will drift into the open season, and the chances that scofflaws will shorten the closed season *de facto.*

In general, a prohibition against possession is more readily enforcible than a prohibition against disposition. It is a simple matter to count the number or to measure the size of fish a person has in his possession. Proving an intent to sell is more difficult.

### Other Management Plans

On July 20, 1986, the United States Secretary of Commerce closed the federal conservation zone, which is the area more than nine and less than 200 nautical miles out from shore, to the taking of redfish. The Gulf of Mexico Fisheries Management Council (GMFMC) has recommended that the original ban, which was to have been effective only through September 23, 1986, be extended for another 90 days pending adoption of regulations prescribing a permanent ban. The GMFMC has also recommended that the Gulf states adopt regulations that would allow at least a fifth of redfish recruits to escape the estuaries.

As of January 1984, Alabama prohibited the taking of redfish smaller than 14 inches and the taking of more than two redfish larger than 36 inches, placed geographic and temporal restrictions on the use of nets, limited recreational catch to 25 fish per day and imposed a possession limit of 50 on recreational fishermen. Respondent's Exhibit No. 29, 7-16 and 17. Alabama forbids the sale of native redfish. Alabama Administrative Code Section 220-3-12.

As of January 1984, Mississippi placed gear restrictions on fishermen taking redfish, prohibited the taking of redfish in certain places (including Redfish Bayou!) and of a size less than 14 inches, limited to two per day the number of redfish exceeding 30 inches in length, limited recreational catch to 10 redfish per day, imposed a possession limit of 30 redfish, closed state waters to commercial fishing from September 15th to November 15th, and authorized closing of the commercial fishery for the remainder of any year in which landing reports indicate 200,000 pounds have been taken. Respondent's Exhibit 29, 7-14, 15.

As of January 1984, Louisiana closed certain areas to commercial fishing, disallowed the use of certain gear by commercial fishermen in certain other areas, and imposed gear restrictions on all fishermen. Recreational fishermen were limited to two redfish per day more than 36 inches in length but were subject to no minimum size limit. Recreational fishermen were entitled to take no more than 50 spotted

**219**

sea trout and redfish combined per day, and subject to a 100-fish possession limit. Commercial fishermen were subject to a 16-inch minimum size limit but to no maximum size limit. Effective August 30, 1986, counsel advise, recreational fishermen are permitted to keep no more than two redfish greater than 30 inches in length and possession of redfish on board a vessel carrying a purse seine is illegal, citing Act. No. 613, 387, 611, 660.

As of July 1985, commercial fishing for redfish had been outlawed in Texas, although licensed fish importers may, and do, sell redfish from Mexico and other states. No redfish less than 16 inches long or greater than 30 inches in length could be taken. The weekend use (1:00 p.m. Friday to 1:00 p.m. Sunday) of nets and trot lines was forbidden. As of September 4, 1986, the minimum size limit was 18 inches, and hook and line was the only lawful way to take redfish. Respondent's Exhibit No. 2, pp. 77A. At the time Texas dilettantized its redfishery, commercial fishermen were taking most of the catch. Fishermen must use either fishing poles or a single "sail line" which is a "special troutline[ ] with one end on shore, pier or jetty, and with the other end attached to a wind-powered device or sail and attended at all times." Respondent's Exhibit No. 29, 7-7.

### Florida Fisheries.

Fishing gear and methods in Charlotte Harbor, the principal site for commercial redfishing in Florida, have been constant for some time. Since the 1950s fishermen have used synthetic, instead of natural, fibers for their nets. In December, January and February, cold fronts in Charlotte Harbor seem to "concentrate the fish" into schools that experienced fishermen can spot. There is also a "night fishery" in the summer months, when redfish are taken at first light or "dawn pink" Petitioner's Exhibit No. 9, p. 31.

Ninety percent of the redfish commercial fishermen catch in Charlotte Harbor are taken with trammel nets, deployed from flat-bottomed shallow draft boats 19 to 24 feet long, with beams of five to eight feet. Although "pole skiffs" are sometimes used in very shallow water (four inches or less), the boats are mostly powered by outboard motors, mounted forward in wells. In Steinhatchee, the fishermen call these boats "bird dogs." Even the largest of them can be handled by a single fisherman, and can be built with materials that cost less than $3,000. None could be safely taken very far off shore.

Undersize or other undesirable fish taken in trammel nets can be returned to the water alive. Ordinarily trammel nets consist of two outer "walls" of larger mesh flanking a central, finer mesh curtain or

220

"bunt". When the fishermen encircle the fish, the three components of the net stand vertically in the water; the lines along the upper edges of each bunt are kept on the surface by floats, while the weighted lines along the bottom edges fall to the bottom. Fish swimming through an opening in one wall and into the small-mesh bunt push the finer netting through openings in the other wall, which creates a pouch or pocket in which the fish remains ensnared, when the fisherman hauls in the trammel net.

Gill nets, while are also sometimes used, consist of a single swatch with mesh calibrated to stop fish of a certain size. Smaller fish swim through while larger fish are repelled. Fish taken by gill nets die from injuries they sustain when they become lodged in an opening in the net.

In Steinhatchee almost half the redfish sold to the fish houses are caught by hook and line fishermen who have salt water products licenses, which can be bought for $25 and authorize the holder to sell his catch. In Charlotte Harbor, the "bucket brigade" as they are there called makes a contribution, although a less significant one, to the commercial catch. Hook and line fishermen have the advantage, an important one in the Steinhatchee fishery, of being able to take their boats up the river into fresh water. Eighty percent of redfish are caught from boats.

### Making a Payday

Commercial fishermen take only an eighth to a quarter of the redfish caught in Florida state waters. As far as the evidence showed, not a single commercial fisherman in Florida depends exclusively on the sale of juvenile redfish for his income. Redfish comprise less than one percent of the food fin fish commercial fishermen catch in Florida waters. Almost all of the approximately 1800 commercial fishermen in Florida who catch redfish in state waters depend on the sale of other fish for most of their income. At a given time, certain species are available and certain species are not; and the prices they fetch vary. Mullet may bring as little as $.25 a pound while pompano can go for as much as $3.10 per pound.

Commercial fishermen in Charlotte Harbor, whose annual income averages $11,334 after expenses, take mullet, sea trout, pompano, mackerel, jacks and sand bream as well as redfish. Not every fishermen targets each of these fish, but the overwhelming majority do seek mullet, which they call their "bread and butter" fish. Even for those fishermen whose equipment and skills enable them to pursue several species, the different species are not readily interchangeable.

Rather than offering each load of fish they catch to the highest

221

bidder, commercial fishermen like the individual petitioners who testified in the present case, ordinarily sell their catch to a single fish house, year after year. This practice offers some protection against seasonal market fluctuations. When roe mullet begin to run in the fall, demand for these and other fish exceeds the supply. But, during the summer months, the fish house operators will not buy mullet from fishermen with whom they have not already established a relationship. Because supply greatly exceeds demand in summertime and because freezer space is limited, fish house operators impose quotas even on fishermen with whom they have longstanding relationships.

The fish houses do not sell all of the catch locally. About half leaves Florida. Exporters drive refrigerated semi-trailers to the fish houses where they buy fish by the 100-pound box for resale out of state. Georgia, their nearest destination, is several hundred miles from Charlotte Harbor, the principal site of redfishing in Florida waters. Except during the roe mullet run, these drivers call ahead to inquire of the fish houses how many "fancy fish" they have, "fancy fish" meaning redfish or sea trout. If a fish house has no redfish or sea trout on hand, the drivers may pass it by altogether, or, at best, buy only a few boxes of mullet. Explicitly or otherwise, fish houses with redfish to sell may condition their sale on the buyer's taking, along with each box of redfish, four to ten boxes of mullet, depending on market conditions.

### Fishing For Fun

According to those who have studied the question most carefully, including Dr. Holland, who testified at hearing, the attractiveness of recreational fishing trips depends less than might be expected on the hope of catching any fish at all, much less one of a particular species, when several are available. Very few recreational fishermen "limit the goals of their fishing experience to catching fish. The majority are most interested in perceiving freedom, escaping from responsibilities, and enjoying an outdoor natural environment." Petitioner's Exhibit No. 17, p. 137. Things like "being exposed to polluted surroundings . . . ruin[] a fishing trip more than not catching a fish. These conclusions are based on answers given by a sample of fishing association members who actively fish (an average of 31 days a year)." Petitioner's Exhibit No. 17, p. 136.

As Mr. Raulerson explained with reference to tourists who fish in Florida's salt waters, the prospect of catching a fish may be less significant than the prospect of being out on the water in weather much warmer than what the tourist has left behind; and sighting a porpoise can be the principal benefit tourists derive from a fishing trip.

222

For most recreational anglers, keeping a fish to eat is even less important than catching it. The only one of the intervenor's witnesses who testified on the point, Richard A. Shapley, a Tallahassee resident and an IBM employee who goes fishing every weekend, characterized himself as "more of a sports fisherman than a fish eater," (T.VII p. 16) and candidly admitted that he would not be particularly bothered by having to release all the redfish he caught.

Currently, only 7.6 percent of sports fishermen catch more than five redfish per trip. Their catch amounts to eleven percent of the recreational catch, which has accounted for three quarters to seven eighths of all the redfish harvested in Florida waters. Almost five percent (4.975%) of marine sport fishermen in Florida caught (but did not necessarily seek) or sought (but did not necessarily catch) redfish, according to the most reliable statistics available for the period 1979 to 1984.

An economist employed by the Sport Fishing Institute (SFI), whose "programs serve the long-term interests of the sport fishing industry, which provides the base of . . . [SFI's] financial support," Respondent's Exhibit No. 1, p. 1, offered the opinion that up "to $121,416,000 in [1985] retail marine sport fishing expenditures can be attributed to redfish." Respondent's Exhibit No. 1, p. 11. Marine sport fishing is without doubt an important source of income for many Floridians, and retail marine sport fishing expenditures figure significantly in the state's economy, but the SFI estimate of retail expenditures attributable to redfish is a very substantial overstatement.

To obtain the figure of $121,416,000, SFI's economist used a study that attributed to fishing not only all sums expended on fishing trips, but also all food and lodging expenditures for the whole of each day on which a tourist did any fishing; then assumed that catching or seeking redfish was the sole motivation for 4.975 percent of the fishing trips sportsmen made in Florida's salt waters. Neither of these assumptions bears up under scrutiny.

Even on the assumption, which the evidence showed to be contrary to fact, that all fishing trips arise wholly from a desire to catch fish, the use of the 4.975 percent factor was not justified. At least for purposes of the present case, retail expenditures made by fishermen who had no desire or intention to catch redfish can hardly be said to be attributable to the availability of redfish. In addition, the number of recreational fishing trips taken by anglers in pursuit of redfish should, at the very least, be reduced to allow for trips on which the hope of taking other species was the dominant purpose.

## End of An Era

If the proposed rule changes take effect, commercial fishing for redfish in Florida waters will come to an end. The effects of commercial fishermen would be overwhelmingly adverse. The one possible silver lining is that the loss of redfish as a commercial species would make mullet so much harder to sell that marginal commercial fishermen would look for other work, leaving more fish for the more skilled full-time commercial fishermen.

Redfish sells for about eighty cents per pound ex-vessel. At least one fish house has had recent offers of $1.45 or $1.50 per pound for redfish. The economic impact statement puts the secondary wholesale value of redfish at 2.8 times the ex-vessel price. Grocery stores, seafood markets and restaurants sell redfish at retail.

On the assumption that the retailers could substitute imported redfish for native redfish, if commercial fishing is banned by the proposed rule, the economic impact statement ignores retail losses and predicts a "total annual longterm commercial loss . . . [of] approximately $4.733 million in income [which] could force some fishermen and fish houses that rely primarily on redfish out of business." Petitioner's Exhibit No. 5, p. 2. The economic impact statement's analysis assumed a loss of commercial catch of only 961.646 pounds, the 1982-1984 average.

On the same assumption, an economist analyzing the problem from the perspective of sport fishermen, predicted the total economic impact of closing the commercial fishery would be $6,494,629 annually, taking retail sales into account and using certain multipliers. Respondent's Exhibit No. 1, pp. 9 and 10. Neither of these calculations takes into account the economic value of redfish as leverage in mullet sales, although the economic impact statement does mention that "having no redfish to sell will hurt the mullet sales." Petitioners' Exhibit No. 5.

## Fewer, Fatter Fish for Frying

If the proposed rules take effect and the fishery does not collapse, the escapement rate will increase by a factor of 58.43 and, except for the fish that escape, the recreational fishermen will have available not only the fish now caught by commercial fishermen, but also all of the predicted increase in the weight of the redfish catch. The present recreational catch, estimated at 2.1 million pounds, before the new minimum size regulations took effect on September 12, 1985, would grow to 5.65 millions pounds at equilibrium three or four years out. Petitioner's Exhibit No. 4, p. 10. All of this increase would be

attributable to an increase in the average size of the fish caught, because, over the same period, the number of fish caught by recreational anglers would fall from 1,190,000 to 1,030,000. *Id.*

The precise effects these changes would have on the recreational fishing industry are not clear. The two-month closed season would have an adverse affect, since some 7.4 percent of recreational fishing trips on which redfish are caught or sought now occur in March or April. On the other hand, there would be more redfish, they would weight more on average, and they would be more likely to be caught not only during the ten months they could lawfully be taken, but also during the two months when the law would require fishermen to release them, if caught.

The proposed rule would make it more likely that unskilled fishermen who would not otherwise have caught a redfish will catch redfish, and that those who would otherwise have caught less than five will be more likely to catch as many as five. T.X. Skilled fishermen might be discouraged by the proposed five fish bag limit. Increased abundance would presumable by irrelevant to the 7.6 percent of recreational anglers now catching more than the proposed bag limit of five. They may, indeed, be lurged to Alabama where the bag limit is 25, or to some other site.

The effects a change in the availability of redfish might have on recreational fishing were the subject of much testimony at the hearing. The economic impact statement assumed a "response elasticity for non-residents" of 0.1203, i.e., that an increase of eight percent in pounds of redfish available would cause an increase of approximately one percent of the number of fishing trips on which redfish were caught or sought. THe 0.1203 figure is "Green's coefficient," and was used by Green to correlate changes in numbers of fishing trips taken by non-residents already in Florida with changes in multi-species catch (in pounds) per trip, not with changes in the total number of pounds of a particular species available to be caught. As far as the evidence showed, moreover, the weight of fish in Green's study was a good proxy for numbers of fish. In the present case, the increase in weight would occur despite a reduction in the number of fish caught and kept. Despite all the problems, however, Green's coefficient is a much more satisfactory measure of elasticity than any other offered at hearing.

The economic impact statement summed up the situation fairly by saying with respect to recreational fishing, "little is know of the effects of being able to harvest less of one species of fish, especially in saltwater where a multitude of species are available as substitutes."

225

Petitioner's Exhibit No. 5, p. 3. The converse is also true, although fishermen "tend to go to the spot where . . . [they] think . . . [they] can catch the most fish." But the proposed rules would decrease, not increase, the numbers of redfish that recreational fishermen could take. (T.V. 148) Studies in evidence show that increased availability of fish attract fishermen to the site of the increase.

Even if it is assumed that bigger fish attract fishermen just as greater numbers of fish do, it does not follow that the total number of fishing trips occurring everywhere increases, rather than that fishing has fallen off at alternative sites within the fisherman's geographical range (T.V. 147-148) For many tourists the geographical range will be determined by factors unrelated to fishing. Tourists, including tourists who eventually go fishing in salt water here, come to Florida for many different reasons. Perhaps the children want to go to Disneyworld.

Whether a fishing trip is among their recreational pursuits once they arrive depends on how attractive a fishing trip seems in relation to other recreational possibilities. This depends, in turn, on a host of other factors, including, for example, relative cost. The cost of a fishing trip is five times more important than the availability of fish, as a variable determining whether the fishing trip will be taken. Even anglers choosing a Florida vacation in order to go fishing will not necessarily take the availability of redfish into account.

### Enforcement Considerations

Size restrictions are more easily enforced against commercial fishermen than against recreational fishermen, because almost the entire commercial catch moves through licensed, frequently inspected fish houses, while the low numbers of marine patrol officers make enforcement of such regulations against recreational fishermen a haphazard affair. The so-called night fishery for redfish during summer months occurs at first light. Even if fish are taken while it is dark, they must, with few exceptions, move through easily monitored channels if they are to be distributed commercially.

Closed seasons create the possibility of erosion when they begin, by fishermen jumping the gun, and when they end, by fishermen persisting unlawfully. Redfish can be frozen, which makes it difficult to determine just when they were caught. Under the proposed rule, however, frozen redfish can be imported, so the possibility of passing off native redfish as imports would exist, just as, in a mixed fishery with a closed season, the possibility of passing off redfish taken out of season as having been taken lawfully would exist.

There is also the possibility, if bag limits apply to recreational, but

226

not to commercial fishermen, that recreational fishermen will buy salt walter products licenses to escape the bag limits. Such a strategy would appeal to recreational anglers who successfully fish for redfish now. Data from other, similar fisheries suggest that successful anglers' catch goes up proportionally much less than marginal or unsuccessful fishermen's catch in response to increased abundance.

### Recreational vs. Commercial

Economic analyses of intergroup reallocations assume that the marginal utility of income is the same in each group. Since this is unlikely to be the case, such analyses are of limited importance.

The accepted way of compare economic benefits attributable to commercially caught redfish and those attributable to redfish caught recreationally is to sum the producer's surplus and the consumer's surplus for the commercial catch and to do the same calculation for the recreational catch, and then compare the two. But there was virtually unanimity that adequate data do not exist to make these calculations.

This makes the expenditures approach to valuation of redfish taken recreationally one of the few possibilities for quantifying their economic importance. But in a very real way, this approach is all wrong. Attributing fishermen's food and lodging costs to redfish they catch is analogous to allocating to each redfish sold in a restaurant the entire price of the meal, the babysitter's wages, and costs incurred for transportation to the restaurant. An increase in the price of gasoline results in an increase in the value assigned to redfish taken by recreational fishermen, although higher gasoline prices actually make fishing trips and the fish they might yield less attractive.

Dr. Austin offered the most interesting approach, an approach which it is instructive to apply to the numbers Mr. Davis supplied on the last day of hearing. Dr. Austin's technique requires identifying the increase in recreational catch attributable to closing the commercial fishery. A close approximation is possible. The proposed rules would close down the commercial fishery by two overlapping devices: the bag limit and the ban on sale. Mr. Davis supplied the GXPOPS predictions of equilibrium effects for the "18 inch option," which differs from the proposed rules in that it has not bag limit, does not forbid the sale of native redfish, and has no closed season.*

---

* From Table 1 in Petitioners' Exhibit No. 4, it appears that 290,000 pounds are attributable to the closed season, not to gamefish status. (5.65 v. 5.36) Eliminating this variable yields 92 pounds (with a retail value of $248.40) foregone for each recreational trip induced.

According to Mr. Davis, respondent's executive director, recreational fishermen would take 3,950,000 pounds and commercial fishermen would take 1,112,000 pounds of redfish at equilibrium, with an 18 inch option, assuming the fishery did not collapse. At equilibrium under the proposed rules, again assuming the fishery did not collapse, the total annual catch (which would all be recreational) is predicted to amount to 5,650,000 pounds.

At equilibrium, the recreational catch with the proposed rules in place would exceed the recreational catch under the 18 inch option by 1,700,000 pounds* (5,650,000 minus 3,950,000 equals 1,700,000). There would be no commercial catch under the proposed rules, but the 18 inch option would result in annual commercial catches of 1,112,000 pounds, at equilibrium.

With the methodology developed at page four of the economic impact statement, Petitioners' Exhibit No. 5, it is possible to predict a 5.2 percent increase in recreational trips, or an increase of 14,641 fishing trips annually attributable to choosing the proposed rule over the 18 inch option. (283,078) (.1203) (1,700,000 divided by 3,950,000). If the proposed rules are adopted, the commercial sector's loss, at equilibrium, of 1,112,000 pounds a year may be said to have made possible the increase in recreational trips.

Dividing the number of pounds lost by the number of trips gained yields the number of pounds of catch commercial fishermen would have to forego, in order to induce each additional recreational trip. Dividing 1,112,000 by 14,641 yields 76 pounds of commercial catch foregone for each recreational trip induced. The economic impact statement values each recreational trip at $53, citing Bell's study. Petitioner's Exhibit No. 5, p. 7. This compares with the retail price of 76 pounds of redfish—at $2.70 per pound—of $205.20.

Another way to view the economic consequences of reallocation from the commercial to the recreational sector is to compare the relative costs of production, and efficiencies of distribution. Commercial fishermen produce redfish at an approximate cost of $.50 per pound, then introduce them into marketing channels, where they become available to all segments of the population. In contrast, SFI's economist acknowledged that it costs recreational fishermen somewhere between $19.94 and $31.37 per pound to harvest redfish, which is then available only to the sportsman and his circle of acquaintances.

In short, the evidence did not establish an economic justification for closing down the commercial fishery and reallocating most of the fish that would have been taken commercially to the recreational sector.

228

Neither the economic impact statement nor its author, who testified at hearing, claimed a net economic benefit would flow from a reallocation of redfish from the commercial to the recreational fishery. The issue of reallocation is, at bottom, a political question.

## Let Them Eat Mullet

Although some people, like Mr. Shapley, may not be particularly interest in eating redfish, redfish is believed by many to be desirable as food. This includes people who do not own boats or go fishing.

If native redfish becomes unavailable to Florida consumers, who would otherwise have eaten it, they will have to substitute frozen, imported redfish, or another species of fish or some other source of protein.

## CONCLUSIONS OF LAW

The Division of Administrative Hearings has jurisdiction of petitions like the present one challenging proposed administrative rules as an invalid delegation of legislative authority. Section 120.54(4), Florida Statutes (1985).

As the "one who attacks the proposed rule", *Agrico Chemical CO. v. State Department of Environmental Regulation,* 365 So.2d 759, 763 (Fla. 1st DCA 1978) cert. den. 376 So.2d 74 (Fla. 1979) each petitioner shares the burden to:

show that (1) the agency adopting the rule has exceeded its authority; (2) that the requirements of the rule are not appropriate to the ends specified in the legislative act; and (3) the requirements contained in the rule are not reasonably related to the purpose of the enabling legislation but are arbitrary or capricious. *Department of Administration, Division of Retirement v. Albanese,* 455 So.2d 639, 641 (Fla. 1st DCA 1984).

The challengers' burden "is a stringent one indeed." *Agrico Chemical Co. v. State Department of Environmental Regulation,* 365 SO.2d 759, 763 (Fla. 1st DCA 1978) cert. den. 376 So.2d 74 (Fla. 1979).

"[T]he validity of . . . [a challenged] rule must be upheld if it is reasonably related to the purpose of the legislation interpreted and it is not arbitrary and capricious." *Department of Professional Regulation v. Durrani,* 455 So.2d 515, 517 (Fla. 1st DCA 1984).

Moreover, the agency's interpretation of a statute need not be the sole possible interpretation or even the most desirable one; it need only be within the range of possible interpretations. *Department of Health and Rehabilitative Services v. Wright,* 439 So.2d 937 (Fla. 1st

DCA 1983) (Ervin, C.J., dissenting); *Department of Administration v. Nelson,* 424 So. 2d 852 (Fla. 1st DCA 1982); *Department of Health and Rehabilitative Services v. Framat Realty, Inc.,* 407 So.2d 238 (Fla. 1st DCA 1981). 455 So.2d at 417.

Special deference is owed, moreover, to "an administrative agency's exercise of delegated discretion in respect to technical matters requiring substantial expertise." *Island Harbor Beach Club, Ltd. v. Department of Natural Resources,* No. BE-355 (Fla. 1st DCA; Sept. 10, 1986).

The statutes which the proposed rule provisions under challenge purport to implement in the present case require the MFC to exercise discretion both in respect to technical matters and in respect to matters which require a broader perspective.

(1) Pursuant to the policy and standards in s. 370.025, the Marine Fisheries Commission is delegated full rulemaking authority over [certain] marine life, [and]

. . . . . . . . . .

(2) Exclusive rulemaking authority in the following areas relating to [certain] marine life, . . .:

(a) Gear specifications;

(b) Prohibited gear;

(c) Bag limits;

(d) Size limits;

(e) Species that may not be sold;

(f) Protected species;

(g) Closed areas;

(h) Quality control codes;

(i) Seasons; and

(j) Special considerations relating to eggbearing females and oyster and clam relaying.

(3)(a) The commission, pursuant to this act, shall adopt rules pursuant to chapter 120.

Section 370.026, Florida Statutes (1985)

The policy and standards which the statutes set as guides for MFC's rulemaking are set forth in Section 370.025(2), Florida Statutes (1985), which provides:

(2) All rules relating to saltwater fisheries adopted by the department pursuant to this chapter or adopted by the Marine Fisheries Com-

mission and approved by the Governor and Cabinet as head of the department shall be consistent with the following standards:

(a) The paramount concern of conservation and management measures shall be the continuing health and abundance of the marine fisheries resources of this state.

(b) Conservation and management shall be based upon the best information available, including biological, sociological, economic, and other information deemed relevant by the commission.

(c) Conservation and management measures shall permit reasonable means and quantities of annual harvest, consistent with maximum practicable sustainable stock abundance on a continuing basis.

(d) When possible and practicable, stocks of fish shall be managed as a biological unit.

(e) Conservation and management measures shall assure proper quality control of marine resources that enter commerce.

(f) State marine fishery management measures shall assure proper quality control of marine resources that enter commerce.

(g) Conservation and management decisions shall be fair and equitable to all the people of this state and carried out in such a manner that no individual corporation, or entity acquires an excessive share of such privileges.

(h) Federal fishery management plans and fishery management plans of other states or interstate commissions should be considered when developing state marine fishery management plans. Inconsistencies should be avoided unless it is determined that it is in the best interest of the fisheries or residents of this state to be inconsistent.

The biological or resource goal which the MFC set cannot be said to be arbitrary or capricious, just because some reviewing authority might have set it differently, if the task had been his. Establishing a resource goal requires the "exercise of delegated discretion in respect to technical matters requiring substantial expertise," *Island Harbor Club, Ltd. v. Department of Water Resources,* No. BE-355 (Fla. 1st DCA; September 10, 1986), which requires special deference by courts and, presumably, hearing officers, as well.

But the proposed rules under challenge embody more than a biological or resource goal. They also, as they must, represent MFC's effort to comply with the statutory injunction to make "[c]onservation and management decisions . . . fair and equitable to all the people of this state." Section 375.025(2)(g), Florida Statutes (1985). The statute is

clear that the MFC has the power to specify by rule which species may not be sold, where circumstances warrant, but it may not do so arbitrarily or capriciously. MFC rules must be fair and equitable not only in their treatment of fishermen, but also to the extent they affect any other "people of this state," including consumers.

Neither the closed season, the size limits, nor the gear and other restrictions set out in proposed Rule 46-22.006 can be said to discriminate against any citizens of the state. In certain respects, however, the proposed rules are not neutral as between recreational anglers and commercial fishermen. In some respects the proposed rules seem to favor recreational anglers even to the point of compromising their stated objective of replenishing the adult population. To the extent the proposed rule changes would continue to allow the harvesting of four spawners up to 32 inches in length along with one spawner per person per day in excess of that length, they would allow the immediate diminution of significant numbers of the adult fish they are purportedly designed to increase.

The commercial fishermen against whom the discriminatory provisions of the proposed rules would operate are not the commercial fishermen who have so rapaciously exploited redfish populations offshore in recent years. The commercial fishermen who would bear the brunt of the proposed rules have much more modest boats and have used them to harvest redfish in inshore waters at more or less current levels for many years. The proposed rules would end the inshore commercial fishery not so that all the redfish commercial fishermen are now harvesting (for sale to consumers) would be spared, but in order that recreational fishermen who are already taking as much as seven eights of the total catch could have *all* the redfish taken from state waters.

The bag limit of five fish per day, although nondiscriminatory in form, in the sense that it applies to all fishermen, recreational and commercial alike, would have no practical effect on 92.4 percent of recreational anglers, but would have a direct and demoralizing effect on all commercial fishermen. As a practical matter, a bag limit of five applied to commercial fishermen would spell the end of the commercial fishery as surely as the express prohibition on sale and commercial harvest set out in proposed rule 46-22.004. The absence of any provision for by-catch also works a hardship on commercial fishermen. The proposed rules do not merely ban the sale of redfish during a closed season. They forbid the sale of native redfish henceforth forevermore.

To the extent the proposed rules confer gamefish status on redfish,

232

the MFC "has exceeded its authority," *Department of Administration, Division of Retirement v. Albanese,* 455 So.2d 639, 641 (Fla. 1st DCA 1984), on the facts of the present case. The scarcity of other species of animals, deer, turkey, snook among them, has precipitated the choice to end commercial exploitation while allowing their pursuit as game. Texas and Alabama have made this decision about redfish. But such decisions are essentially political ones and, under Florida's regulatory scheme, the legislature has reserved such decisions for itself. Snook became a gamefish, because the legislature enacted a statute. Section 370.111, Florida Statutes (1985)

Administrative agencies are creatures of statute. When the legislature grants power to an administrative agency, "[t]he statute must so clearly define the power delegated that the administrative agency is precluded from acting through whim, showing favoritism, or exercising unbridled discretion." *Lewis v. Bank of Pasco County,* 346 So.2d 53, 56 (Fla. 1977). See *Edgerton v. International Co.,* 89 So.2d 488 (Fla. 1956) ("If there is a reasonable doubt as to the lawful existence of the particular power that is being exercised, the further exercise of the power should be arrested." At 490) "It has long been established law that a statutory agency possesses no inherent powers." *Gardinier, Inc. v. Florida Department of Pollution Control,* 300 So.2d 75, 76 (Fla. 1st DCA 1974). "There must be some basis in a statute for the exercise of jurisdiction and power involved in the making of an order by an administrative agency." *State ex rel. Greenberg v. Florida State Board of Dentistry,* 397 So.2d 628, 635 (Fla. 1st DCA 1974) *cert. dismissed* 300 So.2d 900 (Fla. 1974). Respondent and all other "[a]dministrative agencies are creatures of statute and have only such powers as statutes confer." *Fiat Motors of North America, Inc. v. Calvin,* 356 So.2d 908, 909, (Fla. 1st DCA 1978).

The statutory requirement that the MFC's decisions be fair and equitable to all the citizens of the state is a limitation on the MFC's power, a limitation that precludes the MFC from making redfish a gamefish in the circumstances of the present case, notwithstanding the clear grant of authority to the MFC to regulate in a nondiscriminatory fashion, up to and including a ban on the taking of redfish in state waters altogether, if necessary to conserve the resource.

It is accordingly,

ORDERED:

1. As to that portion of the amendment proposed to Rule 46-22.001 pertaining to bag limits and prohibition of sale, the petition to invalidate proposed agency rules is granted.

2. As to proposed Rule 46-22.004, the petition to invalidate proposed agency rules is granted.

3. As to proposed Rule 46-22.005(2), the petition to invalidate proposed agency rules is granted.

4. In all other respects, the petition to invalidate proposed agency rules is denied.

DONE AND ENTERED this 11th day of October, 1986, in Tallahassee, Florida.